STANDARD FUEL SUPPLY CO. v. GRAY.

(Circuit Court of Appeals, Fifth Circuit.   December 20, 1910.)

No. 2,087.

SHIPPING (§ 184*)—DEMURRAGE—LIABILITY OF CHARTERER—EVIDENCE.

A charterer *held* on the evidence not liable for demurrage because of delay in discharging beyond the lay days fixed by the charter, where it was the duty of the ship to discharge, and it appeared that the charterer supplied facilities for receiving cargo from both hatches, but that the stevedore employed by the master refused to discharge from both because he was paid by the ton and could discharge from one hatch only with less expense to himself.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 596; Dec. Dig. § 184.*]

Appeal from the District Court of the United States for the Southern District of Florida.

Suit in admiralty by W. P. Gray, master of the schooner Kelly, against the Standard Fuel Supply Company.   Decree for libelant, and respondent appeals.   Reversed.

W. E. Kay, for appellant.

E. P. Axtell and C. D. Rinehart, for appellee.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

PARDEE, Circuit Judge.   The issues in this case arise under the sixth article of the libel, to the effect that the charterer did not provide ample and sufficient facilities for the discharge of cargo, causing delay in unloading beyond the limit provided in the charter.

The charter party provided as follows:

"It is agreed that the lay days for loading and discharging shall be as follows: Commencing from the time the captain reports himself ready to receive or discharge the cargo ten running days for loading and discharging. Sundays and legal holidays excepted, and twenty-four hours reporting time at loading and discharging ports.   And for each and every day's detention by default of said party of the second part, or agent, 5¢ per ton B/L weight per day, day by day shall be paid by said party of the second part, or agent, to said party of the first part, or agent.   The cargo or cargoes to be received and delivered alongside within reach of the vessel's tackles."

The main delay of the libelant in discharging cargo, to wit, from July 10th to July 13th, was caused by the master's misunderstanding the provision of his charter party as to whose duty it was to discharge the cargo, and late conclusion that it was the duty of the ship and that he needed therefor a stevedore.

There was only one stevedore available, to wit, a Mr. Warrell, who was agent of the Florida East Coast Railway and also agent of the charterer, and necessarily the libelant employed Warrell to discharge the cargo and thereby got ready to discharge, and commenced discharging on the morning of Tuesday, July 13, 1909, and completed discharging at 10:30 a. m. on the morning of the 19th of July.

It appears, from the master's evidence, the ship reported in Newport News, ready for cargo, at 9 a. m., June 25th; allowing, as re-

quired by the contract, 24 hours for reporting time, the loading days commenced June 26, 1909, and the loading was completed July 1st. As an intervening day was Sunday, exactly five days were taken for loading, leaving five days, exclusive of holidays and Sundays, for unloading within the time fixed in the contract. It follows that on the 17th of July the whole ten days for loading and discharging had expired. Counting from that time, day by day, the ship was delayed the 25th of July and part of the 26th.

The question presented is whether that delay was caused by the fault of the charterer.

Under the contract, the ship had a right to deliver cargo at the end of its tackle—that is, on the wharf alongside of the ship—and it was the duty of the charterer or his consignee to there receive cargo as the ship delivered the same.

The ship had two hatches, but actually delivered from only one hatch at a time. The contention is not that the charterer was in fault for not receiving as delivered, but that the ship could have discharged at both hatches and did not, because the charterer had not provided facilities to receive the cargo that would have been thus delivered.

There is no evidence that the ship specifically tendered to the charterer cargo from more than one hatch. The master testifies:

"We could only work one hatch at a time. I made the offer to use our steam, but Mr. Warrell said they could not do anything with but one hatch—one gang."

Being asked how soon this was after discharging commenced, he said:

"I don't remember. I know that it was one day he was on the wharf working one gang, and I asked if he could not put two gangs on if they used our steam, and he said he could not do anything with two gangs."

He afterwards fixed the time as the day after discharging commenced.

Warrell was the only other witness on the subject, and to understand his evidence in all its bearings it is given in full in note at the end of this case.

From the evidence of neither the libelant nor Warrell can it be found that a tender of cargo from more than one hatch was specifically made by libelant to Warrell as charterer's agent, and yet such tender was necessary to put the charterer in default for not furnishing facilities to receive cargo at ship's side.

The case seems to be that the libelant discussed the matter with Warrell as stevedore, and the libelant did not have the ability to discharge from more than one hatch at a time, because his stevedore could not or would not furnish more men; and, besides, he had only one hoister, and he would not at his own expense and loss use the ship's steam. The situation was peculiar, owing to the conditions at Mayport as to getting stevedore and discharging gang, knowledge of which is chargeable to the libelant, who was required under the contract to discharge his own ship, and although the delay for loading and discharging was limited.

To recover demurrage, the libelant must prove by a preponderance of evidence that the delay was caused by the fault or neglect of the charterer in failing to provide ample and sufficient facilities for the discharge of cargo. The evidence is that ample and sufficient facilities were furnished for all that, under the circumstances, the libelant did or could discharge, and, if the charterer was in fault, it is because it was responsible to the libelant for the circumstances which limited the libelant's capacity to discharge cargo. The libelant knew that Warrell was the agent of the charterer, and yet he employed him to be the ship's agent in the capacity of stevedore. As such stevedore, he seems to have controlled the situation, and apparently he did not much consider the interest of either the libelant or the charterer, but, in the interest of his real principal, the Florida East Coast Railway Company, conducted the business with the view of making most money under his contract which was to discharge the cargo at 25 cents per ton. Any delay over the time limit which resulted is not, under the evidence, imputable to the charterer—certainly not to any such extent as to make him liable for demurrage. The district judge was so doubtful about it that, although he allowed demurrage, he refused libelant costs for lack of diligence in asserting his rights.

It necessarily follows that the decree appealed from should be reversed.

And it is so ordered.

## NOTE.

The evidence of Warrell, referred to in the opinion, is as follows:

"H. O. Warrell, being called as a witness in behalf of the respondent, and being first duly sworn, testified as follows:

"Questions by Col. Kay:

"Q. What is your position at Mayport?

"A. Agent of the Florida East Coast Railway, and do you want to know about the other agency?

"Q. What relation do you bear to the Standard Fuel Supply Company at the time this transaction with the schooner Kelly arose?

"A. As I understand it, I was authorized as their agent to sell their coal.

"Q. The matter I want you to direct your testimony to is in reference to the discharge of this 1,002 tons of coal which arrived in July, 1909, at Mayport, consigned to the Standard Fuel & Supply Company.

"A. And you want me to—

"Court (interrupting): Why didn't you work two hatches?

"A. You see it would have cost us more as stevedores to put up two runways to the vessel, and I told him at the time we reported that we were short of men and had green men working, about half and half, and we would have to send and recruit men to work two hatches, and to work green would cost more than working regular men.

"Q. Who pays for that?

"A. The captain pays for that, so much per ton.

"Q. Who was stevedore for the Kelly?

"A. The Florida East Coast Railway.

"Q. What interest did the Standard Fuel & Supply have in the stevedoring of the vessel?

"A. Nothing in the world.

"Q. The captain has testified that the main reason why two hatches could not be worked was to have discharged from two hatches it would have been necessary to cover with soft coal, hard coal already there. Is that claim correct?

"A. No, sir.

"Q. I will get you to look at this photograph of the situation at Mayport.

"Court: The schooner lay broadside along the wharf?

"A. Yes, sir.

"Q. How was she to discharge cargo?

"A. A bin was built upon the dock—nothing but planking—and there was a runway the whole length of the bin; a runway on each side.

"Q. Show the court the photograph of the dock and point out where the soft coal and the hard coal was discharged.

"(Witness goes up to the judge's bench, with proctors, and explains photograph and answers questions in reference thereto, which the reporter could not hear.)

"(Note by the Judge: Such explanation of said photograph and testimony was in substance that the runway on the right was where the cargo of soft coal was discharged. That on the left was not used, the bin being filled with hard coal. The runway on the left could have been used by building an extension over the hard coal so the soft coal could have been put on the back of the bin without putting the soft coal over the hard coal, but that he had no authority to build such runway.    James W. Locke, Judge.)

"Court: You did not understand that it was part of the duty of the Standard Fuel & Supply Company to provide a convenient place to put the coal?

"A. Yes, sir; but I say they could have delivered the cargo up here—referring to the photograph, pointing to the right hand—they had to take it whether it was convenient to them or not.

"The Court: They refused to take it there?

"A. No, sir; the question was never put up to them—they spoke to me once or twice about working two hatches, but I declined to discharge both hatches. When the captain left it was his intention to claim—he asked me to work two hatches, and I told him I could not.

"Court: As I understand it, had the hard coal not been there, there was no reason why you could not work two hatches?

"A. There was no reason why the coal could not be put out here (indicating on photograph, pointing to the back part of the hard coal bin).

"Court: Why didn't you do it?

"A. Because, judge, the stevedore was the Florida East Coast Railway, and I am not going to the expense of getting up a runway and hiring steam to put it there.

"Q. Now, Mr. Warrell, do I understand you that the existence of this hard coal did not prevent you from rigging up staging and discharging from two hatches?

"A. No, sir.

"Q. It was competent to let the hard coal remain, and put a runway over it and have ample space to discharge from two hatches from the Kelly?

"A. Yes, sir.

"Q. And the reason it was not done, it would cost the stevedore more to discharge from two hatches than one?

"A. Yes, sir.

"Q. You were getting 25 cents per ton from the captain to discharge the cargo, and when the steam was offered, there was nothing said about charging for it?

"A. No, sir.

"Q. And they usually charge for stevedores using steam $10 a day?

"A. Yes, sir.

"Q. You did not feel like paying that?

"A. No, sir.

"Q. What was the weather condition at the time the Kelly was there in July?

"A. I don't remember.

"Q. What time of year was it?

"A. Summer time.

"Q. Was it hot or cold?

"A. Hot.

"Q. What difference does hot weather make in getting men and in their efficiency?

"A. As for getting men, I could not say; but, of course, a man won't work down in the hold of a vessel when the weather is very hot as well as in the winter.

"Cross-examination:

"Q. Did not the master of the Kelly offer you coal to be taken out over that run?

"A. No, sir.

"Q. Did he say anything about it?

"A. He asked me if I could discharge it.

"Q. Didn't he say he did not offer it?

"A. No, sir; he asked me if I would.

"Q. You mean he should go down and shovel it up and offer it to you?

"A. When I say he did not offer the coal to be taken out of there, I mean he did not order me to—he suggested that we take cargo out of there.

"Q. Why didn't you?

"A. The Florida East Coast had only one hoister.

"Q. But you said nothing to him about what he would charge for his steam?

"A. No, sir; customary price is $10.

"Q. The only thing, you would make more as a stevedore working one hatch?

"A. Yes, sir.

"Q. He wanted you to take out coal from both hatches?

"A. Yes, sir.

"Q. And the only reason you could not, you did not have men and could not get others there?

"A. I was short of men and did not have the men.

"Q. And because you did not have a place to put it?

"A. Yes, sir; I could put it back there, but we never argued the question. I told him I could not do it and that ended it.

"Court: The only question is whether the Standard Fuel & Supply Company offered ample facilities for the discharge of that coal within the lay days?

"Q. Did you have space there for the reasonable discharge of the vessel within the lay days?

"A. Yes, sir.

"Q. What figure did the hard coal cut in preventing the discharge if you had wanted to make it?

"(Witness again goes up to the judge's stand with proctors and testifies with reference to the photograph and points out and explains how a runway could have been put up from the main runway so as to have run it over the hard coal into the back of the bin.)

"Q. How many tons could you have put in here (pointing to photograph) and here (pointing to photograph)?

"A. About 400.

"Q. More than was put?

"A. No, before it was full, back here (indicating).

"Q. After you finished?

"A. No, sir; because it was full then.

"Q. You could have taken 1,002 tons?

"A. Yes, sir.

"The Court: The only thing you thought of was you could make more money?

"A. Yes, sir.

"Q. You did not think of demurrage?

"A. Demurrage—we did not think of that.

"Q. You thought you were employed by the captain?

"A. Yes, sir.

"Q. Didn't you consider you were under his orders?

"A. Yes, sir; but I did not think of it that way.

"Q. If you can take coal out of one hatch at a cost of 10 cents, and to take it out of two would cost 20 cents, and you are to get 25 cents, do you think you are doing your duty to only take out of one?

"A. I don't know about that. We did not hold ourselves out as stevedores for the public. About 90 per cent. of the freight coming there is for the Florida East Coast Railway. We did not take advantage of our position. We charged the same as is paid Jacksonville where they obtain 25 cents per ton, and, if we do it for them as cheap as any one else, they should not expect to load unnecessary expense upon us.

"Q. They got 25 cents for bringing a ton of coal? 25 cents per ton was charged for taking it out? They got 55 cents for bringing it?

"A. Yes, sir.

"Q. (by Mr. Axtell). Was Mr. Salas or any other person of the Standard Fuel & Supply Company there while the ship was there?

"A. No, sir.

"Q. You were the only person present representing them there?

"A. Yes, sir.

"Q. You were the person representing them there to say where the coal should be put?

"A. Yes, sir.

"Q. You were the only agent there while the coal was being discharged?

"A. Yes, sir.

"Q. (by Col. Kay). As agent did you have anything to do with the stevedoring the vessel?

"A. No, sir.

"Q. There was ample room to put the coal?

"A. Yes, sir.

"Q. And it was a question of facilities and not a question as to the stevedore?

"A. Yes, sir."